FRANK W. VORSE, Appellant, v. C. C. LOOMIS, Sheriff, *et al.*, Appellees.

Conditional Sale: NOTICE: POSSESSION OF VENDEE: ATTACHMENT. Where a horse power cornsheller was sold under an agreement that notwithstanding its delivery to the vendee the title should remain in the vendor until paid for, and a third party was afterwards permitted to take the sheller from the premises of the vendee to use in shelling corn for others, under an agreement with the vendee to divide with him the profits arising from such use, and while being so used upon the land of another the sheller was levied upon under an attachment against the property of the vendee, *held*, that the sheller was in the

"actual possession" of the vendee within the meaning of section 1922: of the Code, making such sales invalid against creditors without notice, unless duly acknowledged and recorded.

*Appeal from Polk District Court.*—HON. W. F. CONRAD, Judge.

SATURDAY, OCTOBER 22, 1892.

This is an action at law, and it involves the title to a horse power cornsheller. There was a trial by jury, and the court directed a verdict for the defendants. The plaintiff appeals.—*Affirmed.*

*Kauffman & Guernsey*, for appellant.

*Dudley & Coffin* and *Cummins & Wright*, for appellees.

ROTHROCK, J.—There is no real controversy as to the facts in the case. The plaintiff was the owner of the cornsheller in question, and on the twenty-third day of November, 1888, he sold the same to one Whelchell. The sale was entirely on credit. Whelchell gave his promissory notes for the purchase money, and took possession of the sheller under an oral agreement with the plaintiff that the title to the property was to remain in the plaintiff until the payment of the purchase money, and that the plaintiff might resume possession of the sheller at any time he might deem advisable. Whelchell was then, and is now, a farmer, and resides on a farm in Polk county. He took the sheller to the farm where he lived, and used it to some extent. In January, 1889, Whelchell went to the state of California with some horses, and before going away he made an arrangement with one Morning for operating the sheller during his absence. That arrangement is fully set out in the evidence of Whelchell, part of which is as follows:

"I am away from the farm where I live a good deal, as I have worked a good deal as a stock expert. Early in January, 1889, I went away from my farm with some horses to California. I did not know when I was to come back, but left my wife and family on the farm. I returned a few days prior to this levy. I bought this sheller and power from Mr. Vorse in 1888, and the agreement was, that the title should remain in him until I should pay for them. He was to give me a bill of sale when the notes were paid. He said he would use the plan of the sewing machine agents, and the title should remain in him, and I told him that that was all right. I suppose this was to secure the payment of the notes. I took the sheller out to my farm, and used it. When I went away I told Morning that he could take it, and run it, and that I would pay him good wages, or a certain per cent. of the profits. Morning is my brother-in-law, and lives on a farm about a quarter of a mile from where I do. We have separate lands. When I went away I arranged with Morning that he could take the machines and use them, and I would pay him reasonable wages for running the machines, or I was to have a percentage of what was made on running the machines, shelling corn. We had no written agreement. I told him like this: I was going to let the machines lie idle. I could not handle them. If he wanted to do any shelling, he could do it, and if he did not he could let them alone. I think Morning furnished the teams. He may have gotten a team part of the time at my place. I do not know. I think the arrangement was he was to use his own horses. He needed eight horses to run the machine, but the parties for whom the shelling was done furnished half the team, and Morning had four horses. No definite time was fixed during which this agreement was to continue. I returned from California a few day before the writ of attachment was

levied. I have had no settlement with Morning with
reference to the matter. I think the machines were on
my place when I made this arrangement with Morning.
In shelling with a machine like this, we go around the
country as they do with a threshing machine. I do
not know how soon after the agreement was made
Morning took the machines away, and shelled corn
somewhere else. The sheller and power happened to
be on the Wise farm when levied on. I do not know
how long before that he had been shelling corn there.
I was told the sheller was there when it was levied
upon, and that is all I know about it, except that I
went past there a few days after, and saw it there. My
corn had been shelled before I went away, and a part
of Morning's. Morning had no interest in this sheller
himself, and he simply took possession of it because I
told him he might use it if he wanted to. I never sold
the cornsheller, and was never in the implement busi-
ness. I never bought one, but I made a good deal of
inquiry when I wanted to buy, and think I know what
they are worth. I only did a very little shelling with
this sheller before I left for California; probably one or
two jobs. I think very likely I did none except my
own."

The defendant Loomis, as sheriff, levied attach-
ments on the sheller at the suits of the other defend-
ants, who are creditors of Whelchell. The plaintiff
gave notice of his conditional ownership of the prop-
erty, and the controversy between the parties involves
the question whether the conditional contract of sale
was valid as to the creditors of Whelchell whose attach-
ments were levied upon the property without notice
that the plaintiff claimed to be the owner. No part of
the purchase price of the property has been paid by
Whelchell to the plaintiff.

The plaintiff claims that his contract of sale is not
void as to the creditors of Whelchell because, when the

attachments were levied, the sheller was not in the actual possession of Whelchell. The rights of the parties depend upon an application of the conceded facts in the case to section 1922 of the Code, which is as follows: "No sale, contract, or lease, wherein the transfer of title or ownership of personal property is made to depend upon any condition, shall be valid against any creditor or purchaser of the vendee or lessee in actual possession, obtained in pursuance thereof, without notice, unless the same be in writing, executed by the vendor or lessor, acknowledged and recorded the same as chattel mortgages." The only question is, do the facts show that Whelchell should be regarded as in the actual possession of the property when the writs of attachment were levied? It is not contended that Wise, on whose farm the machine was found, was in the actual possession. It is true, it was on his land, but it is to be remembered that the sheller was a machine which was kept for the very purpose of being removed from farm to farm to do its work, the same as a machine for threshing grain. The farmer on whose premises it may be temporarily has no possession of the property, either actual or otherwise. Morning did not have actual possession in the sense that he was present with the machine, and had absolute dominion over it, when the sheriff appeared and made the levy. In determining what is actual possession, regard must always be had to the nature of the property. The actual possession of a watch which is carried upon the person is very different from the actual possession of a machine which is moved about the country from place to place, and, after completing a job in one place, is left temporarily until moved to another place. And as such machines are not operated by one person alone, but in part, at least, by employees, it cannot be said that the actual possession is in the employees, and not in the owner. The facts in this case

show that Morning had the mere temporary use of the machine, not on his own account, but by an arrangement by which he was to receive reasonable wages or a percentage of what was made shelling corn. His possession was nothing more than that of a hired man.

It is claimed with great confidence that under the decision in the case of *King v. Wallace* (78 Iowa, 223), the possession of Whelchell in this case cannot be held to be an actual possession. That was a case of the possession of a stock of goods located in a storeroom, and the business was carried on and conducted throughout by an agent. It was held that as to creditors the agent was in the actual possession of the stock of goods. The fact is, there never was any possession by the principal in that case. As we have seen, the nature of the property is very different in the case at bar. When the levy of the writs of attachment was made it was the right of Whelchell to remove the cornsheller from the farm of Wise; and it was then in his actual possession as much as it could be in the possession of any one, considering the nature of the property and the manner of its use.

We think the court below correctly held that the possession and the right of possession were in Whelchell, and that the conditional sale was, therefore, void as against the attaching creditors.   AFFIRMED.